IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JAMES HICKEY and SHAY GIRARD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 22-00134-JB-M |
| | ) | |
| QBE SPECIALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This Memorandum Opinion follows the Court's Order granting Defendant, QBE Specialty Insurance Company's Motion for Summary Judgment. (Docs. 49 and 73). Upon careful consideration of all relevant filings in the record, and for the reasons stated herein and on the record of the hearing conducted on June 22, 2023, the Court concludes the Motion is due to be GRANTED in all respects.[1]

## BACKGROUND

This is an action on an insurance policy issued by QBE on a house Plaintiffs purchased in Fairhope, Alabama. The Complaint asserts causes of action in contract and tort, based on QBE's alleged failure to investigate and pay a claim under the policy. (*Id.*). By prior Order, the Court granted QBE's Motion, in part, on Plaintiffs' tort claims for negligence, gross negligence, and wantonness. (Doc. 65). The Court also granted QBE's Motion to Preclude Plaintiffs from offering

---

[1] QBE's Motion to Strike Plaintiffs' Response in Opposition to QBE's Motion for Summary Judgment (Doc. 59) is denied to the extent it is directed at Plaintiffs' Response *in toto*. To the extent QBE's Motion is directed at portions of Plaintiffs' Response which proffer undisclosed expert opinion testimony, inadmissible hearsay, and unsupported statements of counsel, the Court resolves those issues herein and in its prior Order (Doc. 65) granting QBE's Motion to Preclude (Doc. 47).

expert testimony.  (Docs. 47 and 65).  This Opinion addresses Plaintiffs' remaining claims for breach of contract and abnormal bad faith.  (Doc. 1-1, Counts I and V, PageID.13 - 15).

At the outset, the Court notes Plaintiffs do not cite any case in their opposition to QBE's Motion for Summary Judgment.  (Doc. 56).  Also, Plaintiffs failed to disclose, and therefore cannot rely on expert opinion to support their claims.  This is a significant failure in light of the technical nature of Plaintiffs' allegations of structural storm damage, water intrusion, water damage, and the development of mold.

## FACTS

Plaintiffs purchased the subject house in Fairhope, Alabama on August 20, 2021.  (Doc. 1-1).  They allege it was damaged nine days later, on August 29, 2021, when Fairhope "suffered the effects of Hurricane Ida" and rain water entered the house.  (*Id.*).  Plaintiffs claim the house sustained water and mold damage.  The house was insured under a policy issued by QBE ("Policy").  (*Id.; see* Doc. 50-10).

Plaintiffs were not present at a pre-closing inspection of the house conducted on June 25, and were not in Alabama at the time of the August 29 storm.  They have no personal knowledge of the effects of the storm on the house.  Plaintiffs discovered the alleged damage on September 4, five days after the storm, when they "drove to Fairhope for the Labor Day weekend."  (Doc. 57-24).  They found "water damage in the walls" of the house," stating "[i]t's currently wet and soaked all the way through."  (Doc. 50-24).  Plaintiffs notified their local agent of the damage on September 5.  (Doc. 57-2).  The claim was reported to QBE on September 11.  (Docs. 51 and 51-24).

According to Plaintiffs, the cost to repair the damage immediately after the storm was "modest, perhaps approximately $2,500." (Doc. 56). However, Plaintiffs allege the initially modest damage deteriorated into "substantial water, moisture, and mold damages" because QBE failed to timely investigate and pay their claim. (*Id.*). Plaintiffs now seek damages in excess of $1,000,000.00. (*Id.*). QBE contends Plaintiffs are responsible for deterioration of the initial modest damage because they breached their duty under the Policy to protect the house from further damage. (Doc. 52 at PageID.992 - 993). QBE also contends much of Plaintiffs' claimed damage is not covered because it pre-existed the storm or is associated with a renovation project.

The Policy insures "against direct physical loss." (Doc. 50-10, PageID.478). It excludes coverage for pre-existing damage. (*Id.* at PageID.479, 527 and 528). Plaintiffs have an affirmative duty under the Policy to protect insured property from further damage. This duty includes making reasonable and necessary repairs:

> **C. Duties After Loss**
>
> In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either:
>
> . . .
>
> 4.  Protect the property from further damage. If repairs to the property are required, you must:
>
>     . . .
>
>     a.  Make reasonable and necessary repairs to protect the property; and
>     b.  Keep an accurate record of repair expenses;

(Doc. 50-10 at PageID.483).

Coverage for mold, encompassed in a Policy endorsement for "Fungi, Wet or Dry Rot, or Bacteria," is limited to $5,000.  (Doc. 5-10).  Such coverage is available "only if all reasonable means were used to save and preserve the property from further damage at and after the time" of the loss:

**LIMITED FUNGI, WET OR DRY ROT, OR BACTERIA**
**COVERAGE**
**SCHEDULE**

| | | |
|---|---|---|
| These limits of liability apply to the total of all loss or costs payable under this endorsement, regardless of the number of "occurrences", the number of claims made, or the number of locations insured under this endorsement and listed in this Schedule. | | |
| 1. | **Section I – Property Coverage Limit Of Liability for the Additional Coverage "Fungi", Wet Or Dry Rot, Or Bacteria** | $ 5,000 |
| 2. | **Section II – Coverage E Aggregate Sublimit of Liability for "Fungi", Wet Or Dry Rot, Or Bacteria** | $ 5,000 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | |

**DEFINITIONS**
The following definition is added:
 **"Fungi"**
  **a.** "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

. . .

**SECTION I – PROPERTY COVERAGES**
**E. Additional Coverages**
. . .
  The following Additional Coverage is added:
**13. "Fungi", Wet Or Dry Rot, Or Bacteria**
  **a.** The amount shown in the Schedule above is the most we will pay for:
   **(1)** The total of all loss payable under Section I – Property Coverages caused by "fungi", wet or dry rot, or bacteria;
   **(2)** The cost to remove "fungi", wet or dry rot, or bacteria from property covered under Section I – Property Coverages;

4

**(3)** The cost to tear out and replace any part
of the building or other covered property
as needed to gain access to the "fungi",
wet or dry rot, or bacteria; and

**(4)** The cost of testing of air or property to
confirm the absence, presence or level of
"fungi", wet or dry rot, or bacteria whether
performed prior to, during or after
removal, repair, restoration or
replacement. The cost of such testing will
be provided only to the extent that there
is a reason to believe that there is the
presence of "fungi", wet or dry rot, or bacteria.

**b.** The coverage described in **13.a**. only applies
when such loss or costs are a result of a Peril
Insured Against that occurs during the policy
period and only if all reasonable means were
used to save and preserve the property from
further damage at and after the time the Peril
Insured Against occurred.

(*Id.* at PageID.507).

The Policy includes a $15,500 deductible for losses caused by a "Windstorm," defined as

"a storm system that has been declared a tropical storm or hurricane by the National Hurricane

Center of the National Weather Service."   (Doc. 50-10 at PageID.499).

It is undisputed QBE paid $214,426 under the Policy, net of the Windstorm deductible.

QBE contends it has not denied Plaintiffs' claim.

**LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted

only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  The movant bears "the initial burden to show the district court, by reference

to materials on file, that there are no genuine issues of material fact that should be decided at

5

trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). This initial burden may be satisfied (1) by "negating an element of the non-moving party's claim," or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id.* "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.*; accord *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); accord *Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608. "If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ....").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant ...." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

**ANALYSIS**

I.     **Breach of Contract Claim**

QBE argues it is entitled to summary judgment on Plaintiffs' breach of contract claim because they have failed to produce sufficient evidence of a "direct physical loss" to the house caused by the storm, or sufficient evidence that such loss caused water intrusion, water damage, and mold.  (Doc. 51).  In a related argument, QBE contends Plaintiffs' inability to produce expert evidence is fatal to their breach of contract claim.  QBE also moves for summary judgment based on Plaintiffs' alleged breach of their duty to protect against further damage, the $5,000 Policy limitation for mold, and the $15,500 named storm deductible.[2]  The Court addresses each argument in turn.

**"Direct Physical Loss" and Causation**

Under Alabama law, Plaintiffs must produce substantial evidence of a direct physical loss or tangible injury to the house by "some immediate or proximate cause" covered by the Policy. *Hillcrest Optical v. Continental Cas. Co.*, 497 F. Supp. 3d 1203, 1210 - 11 (S.D. Ala. 2020) (quoting *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 310 (Ala. 1999)).  More specifically, Plaintiffs must produce sufficient evidence of stormwater incursion into the house, and that such incursion caused the alleged water and mold damage.  *Ware v. Nationwide Ins. Co.*, 2013 U.S. Dist. LEXIS 52641 (N.D. Ala. April 12, 2013).

The Court finds *Ware* especially analogous and persuasive.  The plaintiffs in *Ware* claimed water entered their house through a storm-damaged roof, and attempted to support the claim

_____
[2] QBE also moves for summary judgment on grounds that Plaintiffs concealed and misrepresented material facts. The Court does not address that ground, as it finds summary judgment is due to be granted on the independent bases set out herein.

with evidence of heavy rains.  2013 U.S. Dist. LEXIS 52641, at 12 and 15.  The court, however, found such evidence insufficient to survive the insurer's motion for summary judgment.  "[I]t is not enough for Plaintiffs to establish that heavy rains occurred in Alabama in 2009. Rather, Plaintiffs must demonstrate that the water from those rains entered the home through the allegedly storm-damaged roof …."  *Id.* at *12.  The court in *Ware* also held expert testimony was required to prove the alleged roof damage was caused by a storm, and, that the storm-damaged roof caused water damage:

> A lay witness is not capable of testifying about whether roof damage arose due to a product defect, poor workmanship, natural wear and tear, storm damage, or some other cause. Nor is a lay witness capable of opining that a storm-damaged roof resulted in specific water damage in the ceiling, or that a storm-damaged air conditioning unit resulted in standing water under the house. *See* Fed. R. Civ. Evid. 701(c) (stating that lay witness opinion must "not [be] based on scientific, technical, or specialized knowledge withing the scope of Rule 702"). Rather, expert testimony would be required on these disputed points.

*Id.* at *16.

Plaintiffs fail to distinguish *Ware* or any of the cases upon which QBE relies.  They cite no case whatever.  Plaintiffs' failures are at their peril, and do not impart a "burden on this Court to 'fill in the blanks' in the legal analysis and briefing on [their] behalf."  *Quinn v. Deutsche Bank Nat'l Trust Co.*, 2014 U.S. Dist. LEXIS 32401, *26 (S.D. Ala. March 24, 2014) ("Nor will the Court scour uncited portions of the record in search of evidence that might bolster plaintiff's position. *See, e.g.*, Rule 56(c)(3) ('[t]he court need consider only the cited materials' on summary judgment); *King v. ST Aerospace Mobile, Inc.*, 2013 U.S. Dist. LEXIS 82270, 2013 WL 2635926, *1 n.1 (S.D. Ala. June 11, 2013) ('This Court will not scour uncited portions of these exhibits in hopes of unearthing potentially helpful factual nuggets that the parties have not addressed.')").

By prior Order (Doc. 65), the Court granted QBE's motion to preclude Plaintiffs from offering expert opinion, as a consequence of their admitted failures to disclose experts as required by Rule 26 of the Federal Rules of Civil Procedure and to respond to QBE's expert discovery requests.  (*See* Docs. 47, 54, 55 and 65).  Plaintiffs are specifically precluded from offering expert opinion regarding causation and costs of repair.  (*Id*).  This preclusion prevents Plaintiffs' reliance on an EPA publication entitled "Mold, Moisture, and Your Home" (Doc. 46-1), a Capital Beltway Environmental "Mold Spore-Trap/Swab Report and Results" (Doc. 46-2), and a "Certificate of Mold Analysis" by Priority Labs (Doc. 46-8).  Plaintiffs have no expert opinion to support their allegations the storm caused "direct physical loss" to the house, that such loss caused water intrusion into the house, or that such water intrusion caused water damage and mold inside the house.  Plaintiffs' breach of contract claim fails on this basis alone.

QBE offers properly disclosed expert opinion, which Plaintiffs cannot rebut, that there was "no direct, sudden, or accidental damage noted to the roof."  (Doc. 50-18).  QBE also offers properly disclosed expert opinion, which Plaintiffs cannot rebut, of pre-existing damage and mold.  (Docs. 51 at PageID.990 ("Fact 13")), 50-5, 50-11, 50-12 and 50-13).  The undisputed evidence of pre-existing mold complicates Plaintiffs' allegation of post-storm-caused mold growth, a complication which underscores the significance of Plaintiffs' lack of experts.

Additionally, Plaintiffs do not have personal knowledge that the storm caused a direct physical loss to the house, or that storm water entered the house as a result and caused damage. Rather, Plaintiffs offer evidence regarding conditions of the house prior to and after the storm. (Doc. 56 at PageID.1164 - 1165).  Here, they are attempting to prove causation based on evidence that moisture damage and levels after the storm were greater than before the storm.  This

argument fails as a matter of law, and is unsupported by substantial evidence.  First, it is a fallacious *post hoc ergo propter hoc* argument.  It is based on the false premise that a temporal relationship proves a causal relationship.  As a matter of law, temporal sequence alone does not create a genuine issue as to causation.  For example, the court in *Chappell v. United States* stated:

> [T]emporal sequence is necessary to establish causation but in itself is insufficient to create a genuine issue as to causation. *See Abebe v. Thermo Fisher Scientific, Inc.*, 711 F. App'x 341, 342 (7th Cir. 2018) (stating that plaintiff "offers no evidence of causation other than the temporal sequence, but *post hoc ergo propter hoc* is not a reliable means of showing causation."); *Howard v. City of Coos Bay*, 871 F.3d 1032, 1046 (9th Cir. 2017) ("[W]e are mindful of avoiding 'the logical fallacy of post hoc, ergo propter hoc.'"). *Post hoc ergo propter hoc* is "a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005); *see also Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) (noting "the *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence"). "Timing may be an important clue to causation, but does not eliminate the need to show causation . . . ." *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998).

2020 U.S. Dist. LEXIS 143880, *16 (N.D. Fla. July 16, 2020).  Similarly, the Eleventh Circuit explained:

> "'[P]roving a *temporal* relationship . . . does not establish a *causal* relationship . . . . [S]imply because a person takes drugs and then suffers an injury does not show causation.' *McClain* [*v. Metabolite Int'l, Inc.*], 401 F.3d [1233,] 1243 (emphasis in original). This is a classic '*post hoc ergo propter hoc'* fallacy which 'assumes causation from temporal sequence. It literally means 'after that, because of this'. . . . It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship.'" *Id.*

*Kilpatrick v. Berg*, 613 F.3d 1329, 1343 (11th Cir. 2010).

The evidence Plaintiffs offer in support of this flawed legal argument, taken in the light most favorable to them, is insufficient to create a genuine issue of material fact.  Apart from inadmissible reports of expert inspectors, Plaintiffs have not offered sufficient evidence

connecting alleged conditions of the house to the storm, or distinguishing post-storm damage from pre-storm damage.

As proof of the pre-storm condition of their house, Plaintiffs rely on testimony of their home inspector which, they contend, indicates "only one wall in one room with a minimally elevated moisture reading" was noted.  (Doc. 56).  The inspector's testimony constitutes expert opinion and is therefore precluded.   Even if it were not, it is undisputed the inspector actually found evidence of multiple instances of rot, moisture stain, elevated moisture readings, moisture damage and mold, including the primary bedroom, two bathrooms, and a ground floor finished room.  (Docs. 50-5, 50-11, 50-12, and 50-13).

Plaintiffs also rely on an inspection report provided by Four Site Services.  (Doc. 57-1).  It is undisputed the Four Site report revealed no water or moisture damage, but this report was of an inspection conducted *after* the storm – on September 1, 2021.   (*Id.* at PageID.1275).

Plaintiffs next offer an affidavit of their real estate agent, Preston Niemeyer.  (Doc. 56 at PageID.1164).  Mr. Niemeyer states he "did not see any evidence of mold" during his attendance of a pre-closing inspection, but it is undisputed he did not conduct the inspection.  (Doc. 57-1 at PageID.1290).   Furthermore, Mr. Niemeyer's conclusions about mold, which he prefaces by noting his "profession of adjusting catastrophic" claims and his experience of "complex analysis" of property losses, constitute precluded expert opinion.  (*Id.*).

Plaintiffs also rely on observations of two persons they retained in connection with their renovation project.  (Doc. 56 at PageID.1164).  Plaintiffs argue their renovation project manager, Savannah Starring, took photographs "demonstrating the general good condition of the structure."  (*Id.*).  However, Ms. Starring's undisputed testimony confirms she observed moisture

peeled paint, as well as buckling sheetrock from moisture.  (Doc. 60-1 at PageID.1743 - 1744).

Plaintiffs' renovation designer, Britney Pronesti, saw no signs of water damage during a pre-

closing visit to the property.  (Doc. 56).  Her complete testimony, though, includes her admission

that she was not paying attention for signs of water damage.  (Doc. 57-1 at PageID.1370).

Plaintiffs likewise have failed to produce substantial evidence of post-storm conditions

caused by the storm, as distinguished from pre-existing conditions.  (Doc. 56 at PageID.1164 -

1165).  Plaintiffs and Ms. Starring observed water damage at the house after the storm, but

neither testify (nor could they) that the damage they observed was caused by the storm.

Plaintiffs do argue there are inspections "finding water damage resulting from" the storm, but

they do not support their argument with admissible evidence.  (*Id.* at PageID.1164).  Plaintiffs cite

testimony of Ms. Starring that is entirely inadmissible hearsay.  (Doc. 57-2).  They also cite a

remediation estimate from Rytech.  (Doc. 57-2 at PageID.1400 - 1415).  Other than noting a "Date

of Loss" of September 17, 2023 (some 20 days after the storm), the Rytech estimate does not

support Plaintiffs' characterization of an inspection finding water damage caused by the storm.

Furthermore, Plaintiffs are precluded from offering the Rytech estimate, as well as the Priority

Labs Mold Analysis (*id.* at PageID.1417) on which they rely.  Plaintiffs also cite the Capital Beltway

Environmental Mold Spore-Trap/Swab Report and Results Protocol, a Rainbow International

estimate (*id.* at 1431), and a letter from MKA International, Inc., Construction Consultants and

Engineers (*id.* at PageID.1449 and 50), but these too are unsupportive and precluded.

Plaintiffs also argue QBE's application of the named storm deductible and its partial

payments in excess of $200,000 should be deemed as QBE's acknowledgment of "physical loss"

and damages that "are or could be the result of Hurricane Ida and therefore 'covered.'"  (Doc. 56

at PageID.1167).  Plaintiffs cite no authority to support this argument, and it is otherwise undermined by the undisputed facts in the record.[3]

In sum, Plaintiffs cannot produce expert opinion or substantial evidence on the issues of a direct physical loss to the house, or that such loss caused water intrusion, water damage and mold.  Plaintiffs have failed to demonstrate a genuine issue of material fact that their claimed loss is covered under the Policy.

**Plaintiffs' Duty to Protect Against Further Damage**

Plaintiffs do not dispute QBE's statement of "Facts" regarding their failure to protect the house from further damage after they discovered the initially "modest" damage.  (Doc. 51 at PageID.992 - 993).  It is undisputed the Policy imposed on Plaintiffs the duty to protect their house from further damage, and that they were aware of that duty.  QBE reminded Plaintiffs of their duty, after QBE was advised CodeBlue informed Plaintiffs that QBE would be in touch regarding next steps in the claims process.  Plaintiffs did not arrange for repairs to prevent further damage until approximately five weeks after they discovered the initial damage.  (Doc. 51 at PageID.992 ("Fact 23")).  Plaintiffs argue, however, they did take timely action, or that QBE prevented them from doing so by its lack of diligence, communication, and follow-through.  (Doc. 56 at Page.ID1176).  They contend, "[a]t the least, these circumstances give rise to sufficient questions of fact concerning the extent to which any alleged failure on the part of Plaintiffs is attributable

---

[3] The Court is not obligated to conduct research for a party which advances unsupported legal argument.  *See, e.g.*, *Vision Bank v. Merritt*, 2010 U.S. Dist. LEXIS 129885, *13 -14 (S.D. Ala. Dec. 8, 2010) (granting summary judgment and stating if a party "wishes to pursue such a legal theory, it is incumbent on him to perform the necessary research and develop that argument, rather than stating it in the vaguest of outlines and expecting this Court to fill in the gaps. *See generally Federal Ins. Co. v. County of Westchester*, 921 F. Supp. 1136, 1139 (S.D.N.Y. 1996) ("Under the adversary system, it is counsel's responsibility to explain why these points have legal merit; the Court does not serve as counsel's law clerk.").")

to [QBE's] actions and inactions." (*Id.*).  Plaintiffs cite no authority for this argument, which, in any case, is unclear.  Plaintiffs do not explain how QBE's actions or inactions "prevented" them from acting.  Or, if Plaintiffs are suggesting some sort of waiver or estoppel of their "Duties after Loss" under the Policy, they do not explain or support such suggestion with legal argument and authority.

### The Policy Limitation for "Fungi, Wet or Dry Rot, or Bacteria"

QBE argues the $5,000 Policy limit for "Fungi, Wet or Dry Rot, or Bacteria" (mold) damage is applicable.  (Doc. 50-10 at PageID.507).  Plaintiffs contends the limit is inapplicable, "because the mold resulted from Category 3 water, also known as 'black water.'"[4]  (Doc. 56).  In support, Plaintiffs cite a single page of the Policy.  Nothing on the cited page appears to support or even address Plaintiff's contention.  Plaintiffs cite no legal authority.  Furthermore, Plaintiff's argument is based on technical storm and water-quality classifications, and thus requires expert testimony which Plaintiffs cannot produce.  Plaintiffs also contend the mold limitation "generally is inapplicable" because QBE is alleged to have caused the mold.  Apart from this contention also being without supporting legal argument or authority, it is without merit based on the undisputed facts relating to Plaintiffs' breach of their Policy duty to prevent further damage.

The "Fungi, Wet or Dry Rot, or Bacteria" Policy $5,000 limit for mold applies.  It is undisputed QBE has satisfied this limit.

---

[4] Plaintiffs failed to rebut QBE's statement in its Motion that the storm reached Fairhope as a tropical storm (Doc. 51), not a Category 3 hurricane.

## II.     Abnormal Bad Faith Claim

QBE argues it is entitled to summary judgment on Plaintiffs' abnormal bad claim because they have failed to demonstrate a genuine dispute of material fact concerning QBE's alleged failure to pay, the thoroughness of its investigation of Plaintiffs' claim, or the reasonableness of its decisions based on its investigation.  (Doc. 51).

QBE correctly sets out the law governing abnormal bad faith under Alabama law, citing *Harris v. Universal Prop. & Cas. Ins. Co.* 2023 U.S. Dist. LEXIS 40634 (N.D. Ala. March 10, 2023). The court in *Harris* explained:

> On an abnormal bad faith claim based on an alleged failure to investigate, a plaintiff must show "(1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim." *Simmons v. Congress Life Ins. Co.*, 791 So. 2d 371, 379 (Ala. 2000) (quoting *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 318 (Ala. 1999)). "[I]f the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim." [*State Farm Fire & Cas. Co. v.*] *Brechbill*, 144 So. 3d [248], 257 (Ala. 2013).
>
> Thus, on an abnormal bad faith claim, the "material question" is whether the insurer "recklessly or intentionally failed to properly investigate" the insured's "claim or to subject the results of an investigation to a cognitive evaluation." *Simmons* [*v. Congress Life Ins. Co.*], 791 So. 2d [371], 379 [(Ala. 2000)].
>
> "Regardless of whether the claim is a bad-faith refusal to pay or a bad-faith refusal to investigate, the tort of bad faith requires proof of the third element, absence of legitimate reason for denial." *Brechbill*, 144 So. 3d at 258. A plaintiff "must go beyond a mere showing of nonpayment and prove a *bad faith* nonpayment, a nonpayment without any reasonable ground for dispute." [*National Sec. Fire & Cas. Co. v.*] *Bowen*, 417 So. 2d [179], 183 [(Ala. 1982)] (emphasis in original). In other words, "the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim." *Id.*
>
> In addition, any bad faith claim requires "sufficient evidence of 'dishonest purpose' or 'breach of known duty' . . . through some motive of self-interest or ill

will." *Singleton v. State Farm Fire & Cas. Co.*, 928 So. 2d 280, 283 (Ala. 2005) (quoting *Slade*, 747 So. 2d at 318).

*Harris*, 2023 U.S. Dist. LEXIS 40634, at *12 - 14.  *See also*, *Coleman v. Unum Group Corp.*, 207 F. Supp.  3d 1281, 1284 (S.D. Ala. 2016) (confirming abnormal bad faith claim requires plaintiff to prove the absence of an arguable reason).  Plaintiffs do not attempt to distinguish *Harris*.  They cite no case in opposition to Defendant's Motion or in support of their arguments.

Plaintiffs fail to produce substantial evidence to answer the "material question" raised by their abnormal bad faith claim, *i.e.*, whether QBE "recklessly or intentionally failed to properly investigate" Plaintiffs' claim, or "subject the results of [its] investigation to a cognitive evaluation."  *Harris*, 2023 U.S. Dist. LEXIS 40634, at *12 - 14 (quoting *Simmons*, 791 So. 2d at 379).  They likewise fail to demonstrate a genuine factual dispute regarding the reasonable legitimacy of QBE's reasons for it decisions.  *See Coleman*, 207 F. Supp. 3d at 1284 (a "bad-faith-refusal-to-investigate claim cannot survive where the trial court has expressly found as a matter of law that the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the time the claim was denied."); and *Harris*, 2023 U.S. Dist. LEXIS 40634, at *13 (plaintiff must prove "nonpayment without any reasonable ground for dispute," or "that the insurance company had no legal or factual defense to the insurance claim."  (quoting *Bowen*, 417 So. 2d at 183).

QBE's undisputed investigative activities are set out in "Facts" 25 through 42 of its brief.  (Doc. 51 at PageID.993 - 996).  These undisputed facts undermine Plaintiffs' unsupported arguments of QBE's investigation.  For example, Plaintiffs argue QBE waited eight (8) days to assign an agent after it received their claim.  (Doc. 56 at PageID.1167 – 1168).  Plaintiffs' argument is belied by the undisputed facts in the record.  Plaintiffs reported the loss to their agent on

September 4, six (6) days after the storm.[5]  (Doc. 56 at PageID.1167).  They allege their local agent called in the claim the next day, on September 5, but the document Plaintiffs cite does not support this allegation.  (*Id.* at PageID.1167 – 1168 (citing Doc. 57-2 at PageID.1491)).  To the contrary, it confirms Plaintiffs' claim was not called in to QBE until September 11.  (*Id.* at PageID.1167 – 1168).  QBE assigned an agent on September 13.   Thus, there is no material dispute the storm made landfall on August 29, Plaintiffs reported the loss to their local agent on September 4, their local agent reported the claim to QBE on September 11, and QBE assigned an agent on September 13.

On September 14, QBE assigned Ryze Claims Solutions, an outside adjuster, to investigate Plaintiffs' claim.  Ryze inspected the property, and issued a report on September 20.  Ryze's report noted pre-existing water damage and mold, and the absence of roof damage.   Ryze also submitted an estimated gross repair cost of $5,380.65, which amount is less than the named storm Policy deductible.

Also on September 14, Plaintiffs assigned CodeBlue 360, a water mitigation contractor, which contacted Plaintiffs the same day.  Plaintiffs, however, represented to CodeBlue they had "completely self mitigated" and that "there is currently no interior water damage."  (Doc. 57-2 at PageID.1504).  CodeBlue relayed Plaintiffs' report to QBE:  "[Plaintiffs] do not have any interior water damage and do not require any mitigation services as [they have] completely self mitigated the damages."  (*Id.*).

On September 15, Plaintiffs contacted CodeBlue, this time reporting mitigation was required, as well as a roof tarp.  (*Id.*).  CodeBlue determined it was not then able to respond, and

---

[5] Plaintiffs characterize this as "immediate reporting."  (*Id.* at PageID.1168).

attempted to engage other contractors to perform the work, to no avail.  (*Id.*).  On September 16, CodeBlue notified Plaintiffs and QBE of its and other contractors' inability to respond. CodeBlue advised Plaintiffs "someone will be reaching out" about the "next steps of this process," and informed QBE that Plaintiffs had been so advised.  (Doc. 50-26 at PageID.736).  The same day, QBE sent a letter to Plaintiffs and provided a claims brochure with "additional information about the claims process."  (Doc. 50-25 at PageID.724).  The brochure reminded Plaintiffs of their duty under the Policy to prevent further loss.  (*Id.* at PageID.724 – 728 ("It is your responsibility to take any immediate actions needed to prevent further damage or loss . . ..")).

Plaintiffs argue "there was no follow up" by QBE notwithstanding CodeBlue's assurance and QBE's knowledge of it.  (Doc. 56 at PageID.1168).  However, Plaintiffs cite deposition testimony that does not support their argument.  The testimony, though, does confirm QBE dispatched an adjuster and sent Plaintiffs multiple texts and emails confirming Plaintiffs' mitigation responsibilities under the Policy.  (Doc. 57-2 at PageID.1510 - 1512, 1514 - 1515).

Plaintiffs characterize QBE's failure to "follow up" as a period of "frustrating and unsuccessful" attempts to contact QBE September 13 through October 7.  (Doc. 56).  In support, Plaintiffs offer a table of call logs which they "pertinently summarized." (*Id.* at PageID.1168 - 1172).  However, Plaintiffs' "summary" is deceptively incomplete.  Plaintiffs' "summary" is not the sum of QBE's actions.  Indeed, it omits numerous, undisputed communications between QBE, Plaintiffs, their agent, and vendors during the subject period.  Viewed in the light most favorable to Plaintiffs, the actual sum of QBE's undisputed communications with Plaintiffs, as well as QBE's investigation of and responses to their claim, do not support Plaintiffs' conclusory characterizations.

QBE's undisputed communications include discussions with Plaintiffs or their agent on September 14, 24 and 29, and October 6 and 7. (*Id.*). It is undisputed QBE communicated with Plaintiffs by texts and correspondence on September 13, 14, 16 and 22. (*Id.*). QBE's undisputed Fact 32 notes "numerous communications" between QBE and Plaintiffs from October 4 to 8, including phone calls of seven and 25 minutes on October 6, and phone calls on October 7 of 10, 15, 19 and 25 minutes. QBE spoke with Plaintiffs and their agent on October 7 regarding claim status and Plaintiffs' discovery of mold. (50-27).

In addition to its assignment of Ryze Claims Solutions on September 14, it is undisputed QBE assigned a second outside adjuster, MKA International, to re-inspect the property on October 8. (Doc. 50-34). MKA performed a preliminary inspection on October 12, and issued a report to QBE on October 25 that "interior components of the house were not affected by the hurricane event." (Doc. 50-39). MKA's repair estimate was $1,924, which, like Ryze's estimate, was less than the named storm deductible. (*Id.*).[6]

In November, Plaintiffs submitted an $8,000 invoice to QBE from their remodeling contractor, 5A. (Doc. 51 at PageID.996). QBE investigated the invoice. However, Plaintiffs' mold abatement contractor, Rainbow International, informed QBE the invoice was unrelated to the storm. (*Id.* at PageID.997). Plaintiffs submitted a second, un-itemized 5A invoice to QBE in November, this one in the amount of $490,218. QBE requested an itemized version, which Plaintiffs later provided. QBE forwarded the invoice to MKA for review. (*Id.*). In December, QBE reviewed and paid an invoice submitted by Rainbow in the amount of $21,170. Ineffective

---

[6] Plaintiffs can neither prevail on the argument based on their Alabama Department of Insurance complaint. (Doc. 56 at PageID.1173).

On January 12, 2022, MKA conducted another re-inspection.  (*Id*.).  QBE advanced Plaintiffs $75,000 pending its receipt of MKA's final estimate.  (*Id*.).  On January 31, QBE received MKA's estimate in the net amount of $77,888.  (*Id*.).  QBE paid that amount on the same day. (*Id*.).

Plaintiffs filed this action on February 22.  At the time, although QBE had determined a portion of Plaintiffs' loss was not covered, it was continuing to investigate unresolved issues with the claim.  (*Id.* and Doc. 57-2).

Plaintiffs' abnormal bad faith claim fails as a matter of law.  Viewing the record evidence in the light most favorable to Plaintiffs, Plaintiffs cannot demonstrate a genuine material factual dispute that QBE "recklessly or intentionally failed to properly investigate" their claim, or to "subject the results of [its] investigation to a cognitive evaluation."  *Harris*, 2023 U.S. Dist. LEXIS 40634, at *12 - 14.  Additionally, in light of the undisputed inspection reports and estimates in the record, Plaintiffs cannot demonstrate a genuine factual dispute that QBE had reasonably legitimate or arguable reasons for its decisions and payments under the Policy.  *See Coleman*, 207 F. Supp. 3d at 1284 (a "bad-faith-refusal-to-investigate claim cannot survive where the trial court has expressly found as a matter of law that the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the time the claim was denied.").[7]

The Court concludes that the parties simply dispute the repairs and costs covered under the Policy.  It is undisputed QBE paid all undisputed amounts of Plaintiffs' claims.  Plaintiffs cannot demonstrate a material factual dispute that QBE "recklessly or intentionally failed to

---

[7]  For these same reasons, Plaintiffs' argument based on their Alabama Department of Insurance complaint fails. (Doc. 56 at PageID.1173).

properly investigate" the claim, or that it had a "dishonest purpose" or "some motive of self-interest or ill will." *Singleton v. State Farm Fire & Cas. Co.*, 928 So. 2d 280, 283 (Ala. 2005); *Harris*, 2023 U.S. Dist. LEXIS 40634, at *12 – 14.

## CONCLUSION

Defendant QBE's Motion for Summary Judgment is GRANTED in all respects.

**DONE and ORDERED** this 31st day of July, 2023.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE